PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3793
_____

IN Re: MICHAEL CALABRESE, JR.,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 10-cv-06583)
District Judge:  Honorable Noel L. Hillman

_____

Argued April 11, 2012
Before:  McKEE, *Chief Judge*, HARDIMAN, *Circuit Judge*,
and JONES, II,* *District Judge*.


(Filed: July 20, 2012)



───────────────────

        *The Honorable C. Darnell Jones, II, District Judge for
the United States District Court for the Eastern District of
Pennsylvania, sitting by designation.

Nicholas S. Herron [Argued]
Law Office of Seymour Wasserstrum
205 West Landis Avenue
Vineland, NJ 08360
       *Attorneys for Debtor-Appellant*

Ramanjit K. Chawla [Argued]
Marlene G. Brown
Marikae G. Toye
Office of Attorney General of New Jersey
P.O. Box 106
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625-0000
       *Attorneys for Defendant-Appellee*

Isabel C. Balboa
Office of United States Trustee
535 Route 38 East
Suite 580
Cherry Hill, NJ 08002
       *Attorney for Trustee*

———————

OPINION OF THE COURT

———————

HARDIMAN, *Circuit Judge*.

We consider for the first time whether retail sales taxes are "excise" taxes or "trust fund" taxes under the Bankruptcy Code. The distinction is significant because trust fund taxes are never dischargeable in bankruptcy. *See* 11 U.S.C. §§ 507(a)(8)(C), (E), 523(a)(1)(A).

I

Appellant Michael Calabrese operated "Don's What a Bagel, Inc.," which filed for reorganization under Chapter 11 of the Bankruptcy Code. As proprietor of a restaurant, Calabrese was required by New Jersey law to collect sales tax from his customers. N.J. Stat. Ann. §§ 54:32B-3(c)(1), 54:32B-12(a), 54:32B-14(a). After failing to confirm a reorganization plan, the bankruptcy was converted to Chapter 7. Calabrese also filed a bankruptcy petition under Chapter 13.

The State of New Jersey Department of Taxation (New Jersey) filed several secured proofs of claim in Calabrese's individual bankruptcy. Calabrese moved to have the claims reclassified as unsecured, and the Bankruptcy Court granted his motion. New Jersey thereafter filed amended proofs of claim alleging that Calabrese owes $63,437.19 in taxes collected while operating his business from 2003 to 2009.[1] Calabrese moved to expunge the claims, and after briefing and a hearing, the Bankruptcy Court held the taxes at issue are trust fund taxes under 11 U.S.C. § 507(a)(8)(C) rather than excise taxes under § 507(a)(8)(E). Calabrese appealed that decision to the District Court, which affirmed.

II

The District Court had jurisdiction over the bankruptcy pursuant to 28 U.S.C. § 1334 and to hear the appeal under 28

---

[1] Of this amount, $56,679.78 is subject to a dischargeability determination in this appeal.

U.S.C. § 158(a), and the Bankruptcy Court adjudicated the underlying proceedings under a referral order pursuant to 28 U.S.C. § 157. We have jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291.

This appeal presents a question of law, which we review *de novo*. *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 314 (3d Cir. 2011) (citing *Schlumberger Res. Mgmt. Servs., Inc. v. CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003)).

III

We must decide whether the sales taxes held by Calabrese are "trust fund" or "excise" taxes under 11 U.S.C. § 507(a)(8). Excise taxes receive priority, and are non-dischargeable, if they are less than three years old, as measured from the date of the bankruptcy petition. *See* 11 U.S.C. § 507(a)(8)(E) (priority); 11 U.S.C. § 523(a)(1)(A) ("A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for a tax or a customs duty . . . of the kind and for the periods specified in section 507(a)(3) or 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed . . . ."). Trust fund taxes are always prioritized and are never dischargeable irrespective of the age of the debt. *See* 11 U.S.C. §§ 507(a)(8)(C), 523(a)(1)(A).

Three of our sister courts of appeals have considered the question presented here. In each case, the court determined that the statutory text of § 507(a)(8) does not resolve the dispute. *See Shank v. Wash. State Dep't of Revenue, Excise Tax Div. (In re Shank)*, 792 F.2d 829, 832 (9th Cir. 1986); *DeChiaro v. N.Y. State Tax Comm'n*, 760

4

F.2d 432, 435 (2d Cir. 1985); *Rosenow v. State of Ill., Dep't of Revenue (In re Rosenow)*, 715 F.2d 277, 279 (7th Cir. 1983). Proceeding to analyze the legislative history, all three concluded that a sales tax paid by a third party is a trust fund tax within the meaning of subsection (C), and not an excise tax under subsection (E). These decisions are discussed in greater detail below.

We begin with the text of the statute. The Bankruptcy Code provides in pertinent part:

> The following expenses and claims have priority in the following order:
> . . . .
>
> > (8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—
> >
> > > . . .
> > >
> > > (C) a tax required to be collected or withheld and for which the debtor is liable in whatever capacity;
> > > . . .
> > >
> > > (E) an excise tax on—
> > >
> > > > (i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension,

5

after three years before the date of the filing of the petition; or

(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition . . . .

11 U.S.C. § 507(a).

If Congress has conveyed its intent through the use of unambiguous statutory language, we go no further than the text of the statute to discern its meaning. *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010). Ambiguity is evaluated after "read[ing] the statute in its ordinary and natural sense." *Id.* (internal quotation marks omitted). We read the statutory language in context but resort to legislative history and inquire into the purpose behind the statute only if the textual approach yields no solution to the interpretive problem. *Alli v. Decker*, 650 F.3d 1007, 1011–12 (3d Cir. 2011).

Read in its proper context, § 507(a)(8) is susceptible to two applications to a sales tax owed by a third party and held by a debtor. Although neither subsection (C) nor subsection (E) is unclear, both may be read to apply to this kind of tax. Under New Jersey law, the tax is "required to be collected or withheld" and Calabrese "is liable [for the tax] in whatever capacity." The tax at issue is also an "excise tax," which is "[a] tax imposed on the manufacture, sale, or use of goods," Black's Law Dictionary 646 (9th ed. 2009), or even more

6

broadly, "[a]ny toll or tax," *Excise Definition*, Oxford English Dictionary, http://www.oed.com (last visited July 3, 2012). In short, subsection (a)(8) is ambiguous because it contains two clear but contradictory instructions. Consequently, we agree with the Courts of Appeals for the Second, Seventh, and Ninth Circuits that extra-textual analysis is required to adjudicate this dispute.[2]

IV

A

Congress enacted the first version of what is now § 507(a)(8) as part of the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549. At the time, the list of unsecured governmental claims entitled to priority that is now found in subsection (8) was located in subsection (6). That subsection was the topic of debate. The House bill, H.R. 8200, proposed a subsection (C) covering "taxes required to be withheld from wages, salaries, commissions, dividends, interest, or other payments that were paid by the debtor,"

---

[2] Calabrese argues that the Supreme Court's precedents require us to resolve any statutory ambiguity in favor of the "equal distribution objective underlying the Bankruptcy Code." *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006). But the ambiguity here—unlike the one at issue in *Howard Delivery*—concerns not whether a priority covers a certain type of claim. Instead, the claim at issue here fits within two priorities, and our task is to discern which of the two Congress intended bankruptcy courts to use. Therefore, we do not believe the Supreme Court's rule of "tightly constru[ing]" priorities assists us here, *id.*, for either priority could be narrowly or broadly construed.

which would be dischargeable after two years, along with a subsection (E) allowing for the discharge of excise taxes after one year. H.R. 8200, 95th Cong. §§ 507(6), 523(a)(1)(A) (1st Sess. 1977); *see* H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963. In contrast, the Senate version, S. 2266, prohibited the discharge of "tax[es] required to be collected or withheld" regardless of age, and provided no priority for excise taxes. S. 2266, 95th Cong. §§ 507(a)(6), 523(a)(1)(A) (2d Sess. 1978); *see* S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787.

In lieu of a formal conference, the two chambers informally negotiated an agreement to pass the House bill with significant amendments by the Senate. The Act included a version of § 507(a)(6) that represented "a compromise between similar provisions contained in H.R. 8200 as passed by the House and the Senate amendment." 124 Cong. Rec. 32,398 (1978), *reprinted in* 1978 U.S.C.C.A.N. at 6451; *id.* at 33,997, *reprinted in* 1978 U.S.C.C.A.N. at 6520.

In the process, Congress drafted several pieces of legislative history that suggest different views on how taxes like the one at issue in this appeal should be prioritized. For example, one Report from the Senate Judiciary Committee, which accompanied S. 2266, provides:

> In general, the bill retains two important priority rules of present law: first that priority and nondischarge are recognized for tax claims, for which the tax return was due not more than three years before the title 11 petition was filed, and for withheld income taxes and the employees' shares of social security taxes (the "trust fund" taxes) rceive [sic] priority and are

8

> nondischargeable regardless of the due date of the return.

S. Rep. No. 95-989 at 14, *reprinted in* 1978 U.S.C.C.A.N. at 5800.  That same Senate Report later states:

> Taxes (not covered by the third priority) which the debtor was required by law to withhold or collect from others and for which he is liable in any capacity, regardless of the age of the tax claims (§ 507(a)(6)(D)) are included. This category covers the so-called "trust fund" taxes, that is, income taxes which an employer is required to withhold from the pay of his employees, the employees' shares of social security and railroad retirement taxes, and also Federal unemployment insurance. *This category also includes excise taxes which a seller of goods or services is required to collect from a buyer and pay over to a taxing authority.*

*Id.* at 71 (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. at 5857.  The Senate Finance Committee also issued a Report that is comparable in substance to the Judiciary Committee's Report.  *See* S. Rep. No. 95-1106, at 15–16 (1978).  The House Report accompanying H.R. 8200 discusses subsection (6) briefly, but not in a manner that sheds light on the question we address today.  H.R. Rep. No. 95-595 at 357–58, *reprinted in* 1978 U.S.C.C.A.N. at 6313–14.

After reconciling the Senate and House versions of the bill, the floor managers—Representative Don Edwards and Senator Dennis DeConcini—delivered a Joint Statement to their respective chambers explaining various provisions of the

9

Act. *See* 124 Cong. Rec. 32,392–418, *reprinted in* 1978 U.S.C.C.A.N. at 6436–504 (House floor statement by Representative Edwards); *id.* at 33,992–4,018, *reprinted in* 1978 U.S.C.C.A.N. at 6505–73 (Senate floor statement by Senator DeConcini); *see also* D Collier on Bankruptcy App. Pt. 4(f)(i), at 4-2219 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (explaining that the two chambers agreed on a compromise bill and issued a joint explanatory statement, whose "effect should be the same" as the product of a conference committee). The Joint Statement includes the following passage in the discussion of the subsection under review:

> Fifth. Taxes which the debtor was required by law to withhold or collect from others and for which he is liable in any capacity, regardless of the age of the tax claims. This category covers the so-called "trust fund" taxes, that is, income taxes which an employer is required to withhold from the pay of his employees, and the employees' share of social security taxes.
>
> . . . .
>
> Seventh. Excise taxes on transactions for which a return, if required, is last due, under otherwise applicable law or under any extension of time to file the return, within 3 years before the petition was filed, or thereafter. If a return is not required with regard to a particular excise tax, priority is given if the transaction or event itself occurred within 3 years before the date on which the title 11 petition was filed. All Federal, State or local taxes generally

10

considered or expressly treated as excises are covered by this category, including sales taxes, estate and gift taxes, gasoline and special fuel taxes, and wagering and truck taxes.

124 Cong. Rec. 32,415–16, *reprinted in* 1978 U.S.C.C.A.N. at 6497–98 (Edwards); *id.* at 34,015–16, *reprinted in* 1978 U.S.C.C.A.N. at 6566–67 (DeConcini). As quoted above, the Joint Statement indicates subsection (6) was a compromise between the chambers. *Id.* at 32,398, *reprinted in* 1978 U.S.C.C.A.N. at 6451 (Edwards); *id.* at 33,997, *reprinted in* 1978 U.S.C.C.A.N. at 6520 (DeConcini).

The only explicit reference to the treatment of sales taxes collected from third parties is found in the passage of the Senate Report quoted above, which states that "[t]his category also includes excise taxes which a seller of goods or services is required to collect from a buyer and pay over to a taxing authority."

B

As we have noted, three other courts of appeals have answered the question presented here. In *Rosenow*, after discussing the statement by Representative Edwards on the floor of the House and focusing on the two Reports by the Senate Finance and Judiciary Committees, the Seventh Circuit distinguished the "two types of sales tax liabilities at issue"—those owed by the debtor, and those held by the debtor for another—en route to its conclusion that the Illinois Use Tax was a trust fund tax. 715 F.2d at 279–80; *see Ill. Dep't of Revenue v. Hayslett/Judy Oil, Inc.*, 426 F.3d 899, 904–05 (7th Cir. 2005) (holding that under *Rosenow* the Illinois Motor Fuel Tax falls under § 507(a)(8)(C)). After

11

mentioning the legislative history, the *Rosenow* Court "rel[ied] on the plain language of Section C to conclude that excise taxes which a retailer has collected from purchasers are nondischargeable despite their age." 715 F.2d at 280. *Rosenow* acknowledged that the debtors' "strongest contention[] [was] that the floor manager of H.R. 8200, which ultimately became the new bankruptcy code, referred only to . . . traditional 'trust fund taxes' when discussing Section C; and, when he described the excise taxes covered by Section E, he specifically listed sales taxes." *Id.* at 279 (footnote omitted). But the Court dismissed this argument because "Representative Edwards did not state that sales taxes or excise taxes were intended to be excluded from Section C nor did he say that sales taxes collected by a retailer must be treated under Section E." *Id.* at 280.

The Second Circuit in *DeChiaro* followed the Seventh Circuit's decision in *Rosenow*. Before doing so, it briefly summarized the legislative history, including the history of the Bankruptcy Act of 1898 and amendments thereto. 760 F.2d at 434–35. The Court found "nothing to indicate that Congress intended to change the policy reflected in prior law concerning sales taxes collected from others." *Id.* at 435. *DeChiaro* emphasized the Senate Judiciary Committee Report and characterized the Joint Statement as "floor debate" to justify its result. *Id.* at 435–36.

In *Shank*, a divided Ninth Circuit panel found in the legislative history "no indication that Congress intended to treat retailers differently than employers, who clearly cannot discharge their liability for withheld income taxes." 792 F.2d at 832 (citing *Rosenow*, 715 F.2d at 280). The *Shank* Court based its decision in part on the legislative history of the Bankruptcy Act of 1898. *Id.* at 831–32. The majority

12

bolstered its conclusion with a mention of "public policy considerations," namely its view that "[i]f the obligation to the taxing authority can be discharged by a bankruptcy filing three years after the transaction giving rise to the tax, such an incentive to default will exist." *Id.* at 832.

Judge Reinhardt dissented. Although he "agree[d] with the majority that the words of section 507(a)(6) are unclear," *id.* at 833, the legislative history led him to the opposite ultimate conclusion. Focusing on the contrast between the Senate Reports and the Joint Statement of the floor managers following the compromise, Judge Reinhardt noted three aspects of that statement: first, it describes "excise taxes" as encompassing "sales taxes"; second, the definition of trust fund taxes mentions only income and social security withholdings; and third, the Senate Report's explicit treatment of the third-party sales tax as a trust fund tax does not appear in the final Joint Statement. For these reasons, he inferred that such a tax should be treated under subsection (E). *Id.* at 834–35. He criticized the majority for reaching back to the prior Bankruptcy Act, arguing that it would be "too great a burden" to require Congress to justify each revision to an overhaul of a legislative scheme. *Id.* at 835. He also noted that the cases interpreting that Act on which the majority relied were decided after the implementation of the current Bankruptcy Code and therefore Congress did not have the benefit of their interpretation in rewriting the statute. *Id.* at 835–36. Judge Reinhardt also believed that the *Rosenow* and *DeChiaro* courts misread the legislative history by underestimating the importance of the Joint Statement. *Id.* at 836 ("*Rosenow* incorrectly believed that the Joint Statement reflected the view of the House of Representatives only . . . . In *DeChiaro*, the court also appeared to have misunderstood

13

the nature of the Joint Statement and the compromise it represented, referring to it as mere 'floor debate.'"). Finally, the dissent noted competing policy considerations, observing that Congress is vested with the responsibility of weighing policy interests.[3] *Id.*

C

Reluctant as we are to wade into the murky waters of legislative history, the ambiguity inherent in the text of the statute requires us to do so. However, we can be reasonably confident in looking to the Joint Statement of Representative Edwards and Senator DeConcini as a manifestation of the legislature's purpose, because the Supreme Court has "treated their floor statements on the Bankruptcy Reform Act of 1978 as persuasive evidence of congressional intent." *Begier v. IRS*, 496 U.S. 53, 64 n.5 (1990) (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 351 (1985)); *accord Phila. Newspapers*, 599 F.3d at 335 n.21. And although the question is close, we believe our three sister courts have reached the correct conclusion, even as we do not adopt their logic *in toto*.

The legislative history reveals that the two chambers had different views on the dischargeability of various tax obligations. The House passed a debtor-friendly bill with a

---

[3] Two bankruptcy court decisions cited by the parties reflect Judge Reinhardt's view that third-party sales taxes are dischargeable. *See In re Boyd*, 25 B.R. 1003, 1004 (Bankr. S.D. Ohio 1982) (reasoning that the adoption of subsection (E) evidenced congressional intent to treat all excise taxes separately); *Tapp v. Fairbanks N. Star Borough (In re Tapp)*, 16 B.R. 315, 322–23 (Bankr. D. Alaska 1981) (same).

narrowly defined trust-fund-tax priority and an excise-tax priority, and short windows during which such tax claims could not be discharged. No accompanying report discussed the third-party sales taxes at issue in this appeal. But the trust-fund-tax priority clearly did not cover the third-party sales tax, so the state's only protection from discharge—if it enjoyed any at all—fell under the excise-tax category. By contrast, the Senate bill favored the state (at least with respect to this issue), with a broad trust-fund-tax priority and no excise-tax categorization. The Senate Report states unambiguously that the third-party sales tax is covered as a trust fund tax.

Having expressed divergent views, the House and the Senate compromised to produce a bill that became law. The House received its excise-tax prioritization, while the Senate received a broad trust-fund-tax priority, along with somewhat longer non-dischargeability periods. Looking only to how the text of the bills impacted the statute, we cannot determine where our third-party tax should fall, because each chamber inserted the provision that it had believed at one time would cover such a tax. We also hesitate to base our decision on the Senate and House Reports that predated the compromise. As the Joint Statement itself indicates, and as the Supreme Court and commentators alike have recognized, the Joint Statement is superior to the other evidence of intent that may be found in the legislative record. *See Begier*, 496 U.S. at 64 n.5; D Collier on Bankruptcy App. Pt. 4(f)(i), at 4-2219; Kenneth N. Klee, *Legislative History of the New Bankruptcy Law*, 28 DePaul L. Rev. 941, 957–60 (1979).

Similarly, we decline to hearken back to the nineteenth century bankruptcy law. The *Shank* and *DeChiaro* courts opined that § 17(a)(1)(e) of the Bankruptcy Act of 1898, ch.

541, 30 Stat. 544, 550, *amended by* Pub. L. No. 89-496, § 2, 80 Stat. 270 (1966), combined with Congress's near silence in the history and text of the 1978 Act, indicated congressional intent for trust fund taxes to include third-party sales taxes, and for such taxes to be nondischargeable. *See Shank*, 792 F.2d at 831–32; *DeChiaro*, 760 F.2d at 434–35. It is undoubtedly true that the legislative landscape at the time Congress passes a law sometimes provides evidence of its intent in taking that action. For example, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).

But where, as here, Congress overhauls an area of federal law, we do not think the former legislative scheme is necessarily instructive. *See, e.g.*, *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 52–53 (1982) ("In 1978, after almost 10 years of study and investigation, Congress enacted a comprehensive revision of the bankruptcy laws. The Bankruptcy Act of 1978 (Act) made significant changes in both the substantive and procedural law of bankruptcy." (footnote omitted)); *Shank*, 792 F.2d at 835 (Reinhardt, J., dissenting); S. Rep. No. 95-989 at 1, *reprinted in* 1978 U.S.C.C.A.N. at 5787 ("The purpose of the bill is to modernize the bankruptcy law by codifying a new title 11 that will embody the substantive law of bankruptcy . . . ."). Whether the former legislative scheme is instructive depends on the similarity of the text of the new law to that of the old, and whether there is any evidence that Congress intended to retain a particular feature of the old law.

In this case, there is some evidence that the Senate sought to retain the old definition and treatment of trust fund

16

taxes, *see* S. Rep. No. 95-989 at 14, *reprinted in* 1978 U.S.C.C.A.N. at 5800, but the Senate and the House each made concessions to obtain a passable bill. As a result, the Senate Report alone is of little use in revealing ultimate congressional intent with respect to the enacted law. As Judge Reinhardt noted, the old law "was vastly different in both form and substance from" the new one. *Shank*, 792 F.2d at 835. Without any further indication that Congress intended to leave untouched the old bankruptcy scheme as a baseline against which its new law should be judged, and with a fair amount of evidence that the 1978 Act constituted a brand new framework, the 1898 Act should not factor into our analysis. *See id.* at 836 ("[G]iven the degree of uncertainty that exists, . . . section 17(a)(1) can[not] provide much guidance either way."). We are convinced the Joint Statement of Representative Edwards and Senator DeConcini remains the superior evidence of congressional intent.

Unfortunately, even though the Joint Statement is the best evidence before us, it does not help to decide the question presented. We agree with Judge Reinhardt that the *Shank* majority and the *DeChiaro* and *Rosenow* courts overlooked its importance. *See id.* And yet we cannot agree with his conclusion that Congress intended third-party sales taxes to be treated under subsection (E). Judge Reinhardt suggests three reasons to favor Calabrese's position. He observes that the words "sales taxes" appear in the Joint Statement's description of "excise taxes." *Id.* at 834. Second, the Joint Statement defines trust fund taxes as "'income taxes which an employer is required to withhold from the pay of his employees, and the employees' share of social security taxes,'" a definition that omits the type of tax at issue here. *Id.* (quoting the Joint Statement). And finally,

17

the Joint Statement omits the single sentence from the Senate Report that treats third-party sales taxes as trust fund taxes. *Id.* at 835.

Considering first the definition of "sales taxes" in the Joint Statement, we think this passing mention is of little importance because, when used alone, those words typically refer to taxes owed by a purchaser to the government, and not the third-party variety at issue in this appeal. The second and third rationales offered by Judge Reinhardt are equally shaky, as they rely on omissions in legislative materials. We do not believe that legislative history can be treated with the same rigorous rules that we routinely apply to questions of statutory construction. We will never know why Congress chose not to tell us how to handle third-party sales taxes; it may have been part of an intentional omission on the path to compromise, or it may have been an oversight. In any case, we decline to base our decision on such omissions.

V

Faced with an ambiguous statute and an indefinite legislative history, we turn to public policy. As noted by Judge Reinhardt, these considerations cut both ways. *See id.* at 836. On the one hand, two broad purposes of the bankruptcy scheme enacted by Congress are to give the debtor a new financial start and to keep creditors on an equal playing field.[4] *See BFP v. Resolution Trust Corp.*, 511 U.S.

---

[4] These general policies are frequently overridden by statute. *See, e.g.*, *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) ("The statutory provisions governing nondischargeability reflect a congressional decision to exclude from the general policy of discharge certain

531, 563 (1994) (Souter, J., dissenting) ("[A] maximum and equitable distribution for creditors and ensuring a 'fresh start' for individual debtors[] [are] often said [to be] at the core of federal bankruptcy law."). On the other hand, the incentives for a potential debtor like Calabrese would be quite perverse if, when he sees his business take a turn for the worse, he knows he might obtain a discharge of his debt if he refuses to turn over to the state sales taxes collected from third parties. *See Shank*, 792 F.2d at 832. On balance, we think the second consideration weighs more heavily.

We also find significant the fact that third-party sales taxes resemble trust fund taxes more than other sales taxes even though the source of taxation is a sales transaction. After all, such taxes are owed not by the debtor, but are merely held by the debtor on behalf of the party that owes the tax to be transferred to the taxing authority at a later time. Using similar reasoning, the Supreme Court in *Begier*, considering the interactions of various statutes from the Bankruptcy and Internal Revenue Codes, concluded that taxes required to be withheld by an employer under the Federal Insurance Contributions Act, 26 U.S.C. § 3102(a), are held in trust for the IRS even when those taxes are improperly comingled with the employer's general operating funds. 496

categories of debts—such as child support, alimony, and certain unpaid educational loans and taxes, as well as liabilities for fraud."); *United States v. Sotelo*, 436 U.S. 268, 279–82 (1978) ("[W]hile it is true that a finding of nondischargeability prevents a bankrupt from getting an entirely 'fresh start,' this observation provides little assistance in construing a section expressly designed to make some debts nondischargeable.").

U.S. at 55–67. "Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate[,]' [n]or is [it] 'property of the debtor' . . . ." *Id.* at 59 (quoting 11 U.S.C. §§ 541, 547). The analogy to *Begier* is not a perfect one, but the underlying principle—that the debtor is responsible for money in which he never had an equitable interest—is just as applicable here.

Finally, our decision is consistent with New Jersey's own treatment of its sales tax. Under New Jersey law, "the vendor collects the tax from its customers, and holds it in trust until it is reported and turned over to the State. This is not a tax imposed on the vendor but on the vendor's customer, and as such is what is commonly called a 'trust fund' tax." *Yilmaz, Inc. v. Dir., Div. of Taxation*, 22 N.J. Tax 204, 231 (2005) (citation omitted) (citing *Cooperstein v. State of N.J., Div. of Taxation*, 13 N.J. Tax 68, 78 n.4 (1993)), *aff'd*, 915 A.2d 1069, 1072 & n.3 (N.J. Super. Ct. App. Div. 2007); *accord* N.J. Stat. Ann. § 54:32B-12(a) ("The [sales] tax shall be paid to the person required to collect it as trustee for and on account of the State."). That the Tax Court of New Jersey has recognized its sales tax is a trust fund tax when held by a business owner for the customer validates our common-sense construction of § 507(a)(8).

In sum, we believe public policy concerns weigh against Calabrese, primarily because sales taxes collected by a retailer never become the property of the retailer; *ab initio*, it retains those funds in trust for the state. Accordingly, we hold that Calabrese's sales-tax obligation is subject to § 507(a)(8)(C) and is not dischargeable. We will affirm the order of the District Court.